OPINION
Joseph Harmon appeals from an order entered by the Montgomery County Court of Common Pleas, which affirmed an order of the Civil Service Board of the City of Dayton. The order of the Board had affirmed Harmon's discharge from employment with the City of Dayton. Upon consideration of Harmon's assignments of error and the record, we will affirm the order of the trial court.
Harmon has advanced three assignments of error. The first states:
 THE LOWER COURT ERRED AS A MATTER OF LAW BY MISINTERPRETING AND MISAPPLYING THE MEANING OF THE CITY'S EMPLOYEE RESIDENCY REQUIREMENT IN SUCH A MANNER AS TO REQUIRE THAT ONE'S RESIDENCE IN THE CITY OF DAYTON BE THE SOLE AND EXCLUSIVE RESIDENCE OF THE EMPLOYEE OR THE PRIMARY RESIDENCE OF THE EMPLOYEE.
Harmon was employed as an attorney by the City of Dayton from February 1988 until November 1, 1991, when he was discharged for violating the City's residency rule. He appealed to the Board which twice affirmed his discharge. After both adverse Board rulings, he appealed to the Court of Common Pleas, which reversed and remanded to the Board for further proceedings. After the second reversal and remand by the trial court, Harmon appealed from the trial court's determination that Harmon had to be a domiciliary of the City of Dayton to satisfy its residency rule. The City appealed from the order remanding the matter to the Board for a de novo hearing. In that appeal, we sustained Harmon's assignment of error and interpreted the City's residency rule. We overruled the City's assignment directed to the order of remand for a de novo hearing. Harmon v. City of Dayton (July 26, 1996), Montgomery App. No. 15555, unreported, referred to by the parties and us as Harmon II. Upon remand, the Board again affirmed Harmon's termination, the trial court again affirmed the Board's action, and Harmon again appealed to this court.
The issue in this case is whether Harmon satisfied the City's residency rule while he was a City employee. In Harmon II, we stated that it was not necessary that Harmon be a domiciliary of the City to satisfy its residency rule, which reads as follows:
All employees in the Civil Service of the City of Dayton, appointed after the effective date of this Charter Section, must and shall be actual residents of and physically live in the City of Dayton at the time of their appointment, and shall continue to be actual residents and physically live in the City of Dayton during the term of their employment. (Emphasis ours).
In interpreting the City's residency rule, we adopted — at Harmon's suggestion — a 1977 City residence policy that stated in part:
 "`[a]ctual residence' and `physically live' as used herein requires being physically present and having a particular location as a householder or member of a household for significant parts of each day for important purposes consistent with residence."
We further observed:
 Additionally, the 1977 policy statement identifies "important purposes consistent with residence" as including "where a person eats, where he sleeps, where his family eats and sleeps, where he bathes, where he has telephone service, where he receives mail, or other similar activities."
A review of this standard reveals that it stops short of requiring employees to establish their "domicile," or true, fixed, and permanent home, within the city. It includes no mention of domiciliary intent. However, it requires much more from an employee than simply renting an apartment in the city while regularly living elsewhere. Specifically, the standard requires a city employee to spend significant parts of each day at the location for purposes consistent with residence. This standard demands that civil service workers live day-to-day within the city without requiring them to prove subjective domiciliary intent, i.e., the intent to make the location a permanent home and to remain there indefinitely.
We believe the foregoing standard adequately reflects the city's professed interest in promoting employee loyalty, identity, and community interest. It also reflects the city's stated interest in promoting mutual respect and trust between employees and the residents they serve, and it provides for efficient employee service. Additionally, the standard furthers the city's goal of encouraging employees to maintain a sensitive and courteous attitude toward the public, and it enables employees to participate in various neighborhood and community-wide affairs.
Finally, we are confident that the foregoing standard is definite enough to enable the civil service board and the trial court to apply it fairly.
The evidence established that Harmon leased an apartment in Dayton throughout his employment by the City, but that he also spent a substantial amount of his non-working time at his mother's home in Centerville. Because we determined in Harmon II that Harmon could be a resident of the City without being a domiciliary, and because one can have but one domicile but more than one residence, Harmon contends that the Board and trial court erred in determining that he was a Centerville resident and thereby necessarily violated the Dayton residency rule. (Although neither the Board nor the trial court found that Harmon was a Centerville resident, [the trial court characterized Harmon's activities as "consistent" with Centerville residence], Harmon conceded as much during the Board hearing — Tr. 649 — and bases this assignment on the concept of dual residency).
We do not find that the Board or the trial court misapplied what we said in Harmon II to guide their respective decisional processes. As noted above, the City's residency rule contains two requirements: (1) being an actual resident of AND (2) physically living in the City of Dayton.
In our judgment, Harmon places too much emphasis on the first requirement and too little on the second. Both the Board and the trial court focused on whether Harmon was "physically liv(ing) in" the City of Dayton during his employment, as required by the residency rule as construed in Harmon II. Whether Harmon was properly determined not to be physically living in the City is the topic of Harmon's third assignment. We are, however, satisfied that neither the Board nor the trial court misapplied what we said in Harmon II to Harmon's prejudice.
The first assignment is overruled.
 THE LOWER COURT ERRED AS A MATTER OF LAW BY APPLYING THE WRONG STANDARD OF REVIEW.
Harmon contends that the trial court applied the wrong standard of appellate review to the Board's order.
The trial court must affirm the order of an administrative agency if it is supported by a preponderance of substantial, reliable and probative evidence on the whole record. R.C. 2506.04. Dudukovich v. Housing Authority (1979), 58 Ohio St.2d 202, 207. The trial court cited the statute and Dudukovich in its order affirming the Board.
Harmon contends the trial court applied a "substantial evidence" rather than "preponderance of the evidence" standard because it stated that the Board's order "was supported by the evidence" and "was reasonable and substantiated by the evidence."
Neither of these phrases is inconsistent with the preponderance requirement of R.C. 2506.04. Having cited the statute and Dudukovich, we are not persuaded that the trial court utilized an improper standard simply because it failed to incant the magic words of R.C. 2506.04.
The second assignment is overruled.
 THE LOWER COURT ERRED, AS A MATTER OF LAW, IN CONCLUDING THAT THE APPELLANT FAILED TO ACTUALLY RESIDE IN THE CITY OF DAYTON DURING THE COURSE OF HIS EMPLOYMENT, AS THAT CONCLUSION IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE.
The issue presented under this assignment is whether, as a matter of law, there was a preponderance of substantial, reliable, and probative evidence to support the Board's determination that Harmon violated the City's residency rule. R.C. 2506.04; Dudukovich; Kisil v. Sandusky (1984), 12 Ohio St.3d 30.
The Board made the following "findings of fact," which are more in the nature of a summary of the evidence:
 Joseph P. Harmon, Appellant herein, is an attorney at law and was an employee of the City of Dayton Department of Law from February 1988 until he was discharged on November 1, 1991, for violation of the City's residence requirements.
The matter of the Appellant's residence was first brought to the City's attention by letters mailed to the City advising that Appellant listed an address of 531 Willowhurst Street, Centerville, Ohio, with the Ohio Planning Conference, and that he had also registered for an OPC conference using the Centerville address as his residence. 531 Willowhurst Street is outside the city limits of Dayton, Ohio. The City then hired "Professional Security Associates," a private investigation company, in an attempt to determine the actual residence of the Appellant.
For five evenings, the investigator conducted a surveillance of the Appellant. The dates of these surveillances were randomly chosen and were Thursday/Friday, August 15/16; Wednesday/Thursday, August 21/22; Tuesday/Wednesday, August 27, 28; Monday/Tuesday, September 16/17; and Thursday/Friday, September 26/27, all in 1991. This surveillance consisted of dusk-to-dawn observations, and on all five occasions, Appellant spent the night at 531 Willowhurst Street, in Centerville, Ohio, leaving the next morning. In fact, Appellant spent the first night back from a vacation at the Centerville residence.
When Appellant moved to Dayton from Wisconsin in February, 1988, he leased an apartment at 608 Hampshire Road, which is located inside the City of Dayton limits, and he has maintained this apartment ever since. At this address, Appellant had a telephone, with this address listed in the telephone directory. He also received mail, registered with the Supreme Court of Ohio as an attorney, entertained friends, received medical billings, registered to vote, registered his automobile and driver's license, ate meals, maintained furniture and clothing, used this address on the mailing list of several environmental organizations, and slept there when he was not in Centerville. A neighbor of the Appellant testified that Appellant infrequently used his apartment. However, another neighbor testified that she frequently saw him there. A number of Appellant's friends and co-workers testified that they frequently saw Appellant in the neighborhood, and that they visited him at this apartment. A close friend of Appellant stated that she had visited him there on many occasions, and it appeared to her that he actually resided at this apartment.
When asked by a friend how many days or nights a week he spend (sic) at the Hampshire Road address, Appellant responded, "two, three or four."
Appellant was observed by a co-worker leaving a bus in Centerville, and walking toward his mother's house following work one evening.
On numerous occasions, Appellant also stated on written documents that he resided at the Centerville address. He used that address as a mailing address for several organizations to which he belonged, and he used the Centerville address as a return address on letters which he mailed. On repeated occasions, Appellant adopted the Centerville address at meetings which he attended., Appellant, on the other hand, testified that he used the Centerville address simply to divert mail away from the small mailbox at his Dayton apartment. In support of this testimony, Appellant enumerated several significant purposes for which he used the Dayton address — such as voter registration, driver's license, car title/registration, medical providers, and professional registration with the Ohio Supreme Court.
However, Appellant listed the Centerville address and phone number on his personal business card.
The Centerville address was the house in which Appellant grew up, which was still owned and occupied by his mother. The Appellant was concerned for his mother's physical and mental health, and spent a considerable time at the Centerville address. He ate meals there, did gardening, did repairs about the house, kept his clothes there and slept there. His mother prepared the meals and did his laundry. Appellant admitted in his testimony that he spent as much time at his mother's house as he did at his apartment. Appellant admitted to spending 50% of his time at his apartment, and 50% of his time at his mother's. Appellant testified that he slept at the Willowhurst address from three (3) to five (5) nights per week, and asserted that he had a dual residency in Dayton and in Centerville. Appellant stated that at some time during his employment with the City, he was residing both in Centerville and in Dayton.
The Board further stated:
 In making its decision, the Board considers the following to be most persuasive:
 1. The five dusk-to-dawn observations conducted over a six-week period, revealed that the Appellant spent a majority of his after-work time at the Centerville residence;
 2. The Appellant admitted that he spent a substantial amount of his time at 531 Willowhurst Street, Centerville, Ohio, outside of the City of Dayton;
 3. On numerous occasions, the Appellant admitted on written documents and oral statements that he resided at the Centerville address.
The trial court summarized the Board's findings of fact and what facts the Board had found of particular significance.
We have reviewed the findings of the Board, and we are satisfied that they are, for the most part, rooted in the testimony and other evidence presented at the hearing before the Board.
Although we have not located Harmon's testimony that he slept at his mother's home 3 — 5 nights per week, that fact could have been reasonably inferred from the testimony of Marcus and Gina Mabilitine.
Harmon does not so much attack the findings of the Board as he contends that even if taken at face value, they fail to establish a violation of the City's residency requirement.
The essence of Harmon's argument is capsulized at p. 29 of his brief:
 The overall import is that the average number of overnights at one place or the other, in Centerville and in Dayton, were essentially equally divided. In circumstances such as these, with a proper understanding of the applicable law of residence, the only reasonable common sense application of the law to such evidence would be to consider Harmon a resident of Dayton.
What Harmon's brief ignores is the "physically liv(ing) in the City of Dayton" requirement of the residency rule. Conceding that Harmon established himself as a resident of the City of Dayton, he was also required to live in Dayton. If the Dayton residency rule means anything, it means that a City employee must have his or her principal place of abode within the City of Dayton. We thought we had made this clear to Harmon in Harmon II. Although the evidence as to how Harmon divided his non-working time between his Dayton apartment and his mother's Centerville home was not free of conflict, it was up to the Board and trial court to resolve those conflicts. Id. We believe the Board and the trial court reasonably determined that a preponderance of the substantial, reliable, and probative evidence established that Harmon was not physically living in the City of Dayton as we have construed that requirement in Harmon II.
The third assignment is overruled.
The order appealed from will be affirmed.
YOUNG, J., concurs.